**Lynda S. LAMB and Fuller Lamb, Plaintiffs,**

v.

**UNITED STATES of America and Earl T. Smith, Defendants.**

**Civ. A. No. 80–238–MAC.**

United States District Court, M. D. Georgia, Macon Division.

Nov. 24, 1981.

William H. Major and William B. Brown, Atlanta, Ga., for plaintiffs.

Bernard E. Namie, Macon, Ga., Wilson R. Smith, Lyons, Ga., Denmark Groover, Macon, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

On December 10, 1977, Mrs. Lynda S. Lamb, a resident of Twiggs County, Georgia, fell as she was going in the front door of the Danville, Georgia, United States Post Office. The Post Office building is owned by Earl T. Smith, a resident of Twiggs County, Georgia, and leased to the United States.

Georgia law requires that suits for personal injuries must be commenced within two years of the injury. 1933 Ga.Code Ann. § 3–1004. Within that two-year period Mrs.

Lamb and her husband, B. Fuller Lamb, commenced a personal injury and loss of consortium lawsuit against Earl T. Smith in the Superior Court of Twiggs County, Georgia. At the same time Mr. and Mrs. Lamb were proceeding administratively against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, which require presentation of a claim to the federal agency and either final denial of the claim or failure of the agency to finally deny the claim within six months, as a condition precedent to filing a lawsuit against the United States in United States District Court.

On October 31, 1980, Mr. and Mrs. Lamb voluntarily dismissed their Superior Court of Twiggs County lawsuit against Earl T. Smith and on November 6, 1980, filed their lawsuit in this court against defendants United States of America and Earl T. Smith alleging that the United States is liable in this court under Georgia law and the consent of the United States to be sued in United States District Court as found in the Federal Tort Claims Act, for the personal injuries and loss of consortium sustained by Mr. and Mrs. Lamb, on account of falling as she entered the Post Office and that Earl T. Smith, also a resident of Twiggs County, Georgia, as owner of the premises is also liable for said personal injuries and loss of consortium. Defendant Earl T. Smith has demanded trial by jury.

At pre-trial this court questioned its jurisdiction over the person of defendant Earl T. Smith since plaintiffs Mr. and Mrs. Lamb and defendant Mr. Smith are all citizens of Georgia and diversity of citizenship is thus plainly lacking. 28 U.S.C. § 1332. The parties having submitted their briefs of law, the court must decide whether or not it has jurisdiction of the person of defendant Earl T. Smith.

At pre-trial the court noted that plaintiffs' lawsuit was commenced in this court on November 6, 1980, more than two years after Mr. and Mrs. Lamb allege that she fell and they sustained the complained of injuries and loss of consortium. Plaintiffs re-

sponded that a statute of the State of Georgia provides:

"3–808 (4381) Discontinuance or dismissal

If a plaintiff shall discontinue or dismiss his case, and shall recommence within six months, such renewed case shall stand upon the same footing, as to limitation, with the original case; but this privilege of dismissal and renewal shall be exercised only once under this section. (Act 1847, Cobb, 569. Acts 1855–6, p. 235; 1967, pp. 226, 244.)" *See, Lane v. Wright* (5th Cir. Dec. 15, 1978), 586 F.2d 607.

and that having commenced within the statute of limitations in state court, voluntarily dismissed, and commenced in this court within six months, the statute of limitations was tolled and is not a bar to proceeding in this court. Defendant Smith amended his answer to set forth the statute of limitations as a defense. He asserts that § 3–808 has always been interpreted by Georgia's appellate courts to apply only to courts of the State of Georgia and that it therefore does not apply to an action commenced in a state court, voluntarily dismissed and then commenced in a United States District Court. This question which has also been briefed by the parties will be considered first.

## APPLICABILITY OF GEORGIA'S TOLLING STATUTE TO CAUSE OF ACTION AGAINST EARL T. SMITH

Assuming that the court finds that it has jurisdiction of the person of defendant Earl T. Smith, the cause of action against Mr. Smith will be as it arises under the laws of this state. As to the cause of action and the running of the statute of limitations, plaintiffs and defendants agree with the court that it is a question to be decided under state law the same as it would be if this were a diversity of citizenship case.

In the now famous case of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the Supreme Court of the United States in 1937 in deciding to what extent state law as passed by its legislature compared to as found in the decisions of the courts of the state applied and controlled in a diversity of citizenship case in a United States District Court, stated:

"Third. *Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.* And whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts. As stated by Mr. Justice Field when protesting in *Baltimore & O. R. Co. v. Baugh*, 149 U.S. 368, 401, 13 S.Ct. 914, 37 L.Ed. 772, 786, against ignoring the Ohio common law of fellow servant liability: "I am aware that what has been termed the general law of the country—which is often little less than what the judge advancing the doctrine thinks at the time should be the general law on a particular subject—has been often advanced in judicial opinions of this court to control a conflicting law of a state. I admit that learned judges have fallen into the habit of repeating this doctrine as a convenient mode of brushing aside the law of a State in conflict with their views. And I confess that, moved and governed by the authority of the great names of those judges, I have, myself, in many instances, unhesitatingly and confidently, but I think now 'erroneously,' repeated the same doctrine. But, notwithstanding the great names which may be cited in favor of the doctrine, and notwithstanding the frequency with which the doctrine has been reiterated, there stands, as a perpetual protest against its repetition, the Constitution of the United States, which recognizes and preserves the autonomy and independence of the State—independence in their legislative and independence in their judi-

**1120**

cial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specially authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence."

"The fallacy underlying the rule declared in *Swift v. Tyson* is made clear by Mr. Justice Holmes. The doctrine rests upon the assumption that there is 'a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute,' that federal courts have the power to use their judgment as to what the rules of common law are; and that in the federal courts 'the parties are entitled to an independent judgment on matters of general law:'

'but law in the sense in which courts speak of it today does not exist without some definite authority behind it. The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else. . . .

'the authority and only authority is the state, and if that be so, the voice adopted by the State as its own [whether it be of its Legislature or of its Supreme Court] should utter the last word.' Thus the doctrine of *Swift v. Tyson* is, as Mr. Justice Holmes said, 'an unconstitutional assumption of powers by courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct.' In disapproving that doctrine we do not hold unconstitutional § 34 of the Federal Judiciary Act of 1789, or any other Act of Congress. We merely declare that in applying the doctrine this Court and the lower courts have invaded rights which in our opinion are reserved by the Constitution to the several States." (emphasis added). 304 U.S. at 78, 58 S.Ct. at 822, 82 L.Ed. at 1194.

In 1944 the Supreme Court in *Guaranty Trust Co. v. York* next determined whether or not the law of the state that must be applied includes the state statute of limitations. The Court said:

"And so this case reduces itself to the narrow question whether, when no recovery could be had in a State court because the action is barred by the statute of limitations, a federal court in equity can take cognizance of the suit because there is diversity of citizenship between the parties. Is the outlawry, according to State law, of a claim created by the State a matter of 'substantive rights' to be respected by a federal court of equity when that court's jurisdiction is dependent on the fact that there is a State-created right, or is such statute of 'a mere remedial character,' *Henrietta Mills v. Rutherford County*, supra (281 U.S. at 128, 50 S.Ct. 270, 74 L.Ed. 754), which a federal court may disregard?

"Matters of 'substance' and matters of 'procedure' are much talked about in the books as though they defined a great divide cutting across the whole domain of law. But, of course, 'substance' and 'procedure' are the same key-words to very different problems. Neither 'substance' nor 'procedure' represents the same invariants. Each implies different variables depending upon the particular problem for which it is used. See *Home Inc. Co. v. Dick*, 281 U.S. 397, 409, 50 S.Ct. 338 [341], 74 L.Ed. 926, 934, 74 ALR 701. And the different problems are only distantly related at best, for the terms are in common use in connection with situations turning on such different considerations as those that are relevant to questions pertaining to ex post facto legislation, the impairment of the obligations of contract, the enforcement of federal rights in the State courts and the multitudinous phases of the conflict of laws. See, e. g., *American R. Exp. Co. v. Levee*, 263 U.S. 19, 21, 44 S.Ct. 11, 68 L.Ed. 140, 143; *Davis v. Wechsler*, 263 U.S. 22, 24, 25, 44 S.Ct. 13 [14], 68 L.Ed. 143, 145, 146; *W. B. Worthen Co. v. Kavanaugh*, 295

U.S. 56, 60, 55 S.Ct. 555 [556], 79 L.Ed. 1298, 1301, 97 ALR 905; *Garrett v. Moore McCormack Co.,* 317 U.S. 239, 248, 249, 63 S.Ct. 246 [252], 87 L.Ed. 239, 245, 246, and see Tunks, Categorization and Federalism: 'Substance' and 'Procedure' After *Erie Railroad v. Tompkins* (1939) 34 Ill.L. Rev. 271, 274–276; Cook Logical and Legal Bases of Conflict of Laws (1942) 163–165.

"Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the ·right may at times, naturally enough, vary because the two judicial systems are not identic. *But since a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State,* it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.

"And so the question is not whether a statute of limitations is deemed a matter of 'procedure' in some sense. The question is whether such a statute concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?

"It is therefore immaterial whether statutes of limitation are characterized either as 'substantive' or 'procedural' in State court opinions in any use of those terms unrelated to the specific issue before us. *Erie R. Co. v. Tompkins* was not an endeavor to formulate scientific legal terminology. It expressed a policy that touches vitally the proper distribution of judicial power between State and federal courts. *In essence, the intent of that decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.* The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result. And so, putting to one side abstractions regarding 'substance' and 'procedure,' we have held that in diversity cases the federal courts must follow the law of the State as to burden of proof, *Cities Ser. Oil Co. v. Lunlap,* 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196, as to conflict of laws, *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, as to contributory negligence, *Palmer v. Hoffman,* 318 U.S. 109, 117, 63 S.Ct. 477, [482], 87 L.Ed. 645, 651, 144 ALR 719. And see *Sampson v. Channell,* 110 F(2d) 754, *Erie R. Co. v. Tompkins* has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases in the federal courts. A policy so important to our federalism must be kept free from entanglements with analytical or terminological niceties.

"Plainly enough, a statute that would completely bar recovery in a suit if brought in a State court bears on a State-created right vitally and not merely formally or negligibly. As to consequences that so intimately affect recovery or non-recovery a federal court in a diversity case should follow State law. See Morgan, Choice of Law Governing Proof (1944) 58 Harvard L.Rev. 153, 155–158. The fact that under New York law a statute of limitations might be lengthened or shortened, that a security may be foreclosed though the debt be barred,

that a barred debt may be used as a set-off, are all matters of local law properly to be respected by federal courts sitting in New York when their incidence comes into play there. Such particular rules of local law, however, do not in the slightest change the crucial consideration that if a plea of the statute of limitations would bar recovery in a State court, a federal court ought not to afford recovery." (emphasis added) 326 U.S. 99, 107, 65 S.Ct. 1464 [1469], 89 L.Ed. 2079, 2085.

So it is that it is proper for this court to respect the law of this state as to the statute of limitations. *Henson v. Columbus Bank and Trust Co.*, 144 Ga.App. 80, 240 S.E.2d 284 (1977) in holding that *Henson* could not file a truth-in-lending action in this United States District Court, voluntarily dismiss after the one-year federal statute of limitations had run and recommence in the Superior Court of Muscogee County, well summarized the appellate decision of the courts of this state as to the meaning of Code § 3–808. It stated:

"Though Henson questions the cogency of the reasoning in the cases, it is clear that the law of this state denies Henson the use of the renewal statute to toll the running of the statute of limitations. As was said in *Constitution Publishing Co. v. DeLaughter*, 95 Ga. 17, 21 S.E. 1000 (1894) in a discussion of the renewal statute, at p. 18, 21 S.E. at p. 1000: 'It seems to us to have been the manifest intention of the legislature that it should apply only to state courts, for in the act of 1847 it uses the words "courts of this State," meaning, in our opinion, courts created by the constitution and laws of this state. It confers a personal privilege upon suitors who bring their actions in courts . . . of the state having jurisdiction thereof, where such an action would otherwise be barred by the statute of limitations. While the act of 1856 and the Code both leave out the words "court of this state," we do not think the legislature or the codifiers intended to enlarge this privilege by conferring it upon suitors who commence their actions in the federal courts.' To the same effect, see *Webb v.*

*Southern Cotton Oil Co.*, 131 Ga. 682, 63 S.E. 135 (1908); *Nevels v. Detroiter Mobile Homes*, 124 Ga.App. 112(2), 183 S.E.2d 77 (1971); *Sherrill v. U. S. Fidelity, etc., Co.*, 108 Ga.App. 591, 592, 133 S.E.2d 896 (1963); *Anderson v. Southern Bell T&T Co.*, 108 Ga.App. 314, 132 S.E.2d 820 (1963). These opinions represent an unbroken line of authority that the renewal statute does not apply to actions first commenced in a federal court. We are not persuaded that the logic of those opinions is incorrect even if we were free to disregard their legal precedence."

Since *Henson* did not assert his constitutional "equal protection" rights in the trial court, the Court of Appeals refused to consider his constitutional arguments.

Defendant Smith relies upon those decisions to urge that the Code § 3–808 renewal privilege doesn't exist in a United States District Court civil action that was first commenced in a state court. Plaintiffs rely upon a 1915 opinion of this court in *Fordham v. Hicks*, 224 Fed. 810, when it was named the United States District Court for the Southern District of Georgia and Judge Speer in considering this same question held:

"The suit in the state court was indeed brought within the time fixed by the statute. Code, § 4362. The order of the judge granting the new trial restored the status of the parties antecedently to the verdict. It was then a pending case. The plaintiff dismissed it, and within six months renewed it here. Now the Code also provides (section 4381):

'If a plaintiff shall be nonsuited, or shall discontinue or dismiss his case, and shall recommence within six months, such renewed case shall stand upon the same footing, as to limitation, with the original case.'

"This is also a statute of limitations, and the courts of the United States, in the absence of legislation upon the subject by Congress, recognize the statutes of limitation of the several states, and give them the same construction and ef-

fect which are given by the local tribunals.

"It is however, contended for the defendant that the six months' permission for renewal of a dismissed case applies only to cases pending in the state courts, and *Cox v. East Tennessee & C.R.R.*, 68 Ga. 446, *Webb v. Southern Cotton Oil Co.*, 131 Ga. 682, 63 S.E. 135 and *Constitution Publishing Co. v. DeLaughter*, 95 Ga. 17, 21 S.E. 1000, are cited in support of this contention. It is true that the Supreme Court of the state has explicitly held that:

'When a case has been removed from a state court to the Circuit Court of the United States, the jurisdiction of the former ceases, and after nonsuit in the federal court the case cannot be renewed in the state court within six months, so as to avoid the statute of limitations' *Cox v. East Tenn., etc, R. R.*, 68 Ga. 446.

"The same learned tribunal has held that:

'An action brought in the United States Circuit Court for the Northern District of Georgia, and dismissed by the plaintiff, cannot, under the provisions of section [4381] of the Code, be renewed in [a state court] within six months after such dismissal, so as to avoid the bar of the statute of limitations which had attached before the second action was brought.' *Constitution Publishing Co. v. DeLaughter*, supra.

"It is urged here that the converse of this proposition is true, and that a suit in the state court, if dismissed, cannot be renewed in the United States court. It is, however, true that the remedies and rights granted by state law may be utilized in the United States courts, where the latter otherwise have jurisdiction. *The ruling of the Supreme Court of the state, above cited, while doubtless controlling in the state courts, are not necessarily controlling here.* It is a familiar principle that each court determines for itself its jurisdiction, but in the suit of a citizen of another state the United States court may for itself determine a right or privilege of this class claimed by such

plaintiff. This court would ordinarily not presume to determine whether a case had been properly brought in the state court. By a parity of reasoning we may claim that *a ruling of the state court is not conclusive as to whether a suit is properly brought here.*

"National courts of high authority have in effect taken this view. The right insisted upon by the plaintiff was sustained in *McCormick v. Eliot* (C.C.) 43 Fed. 469 et seq. There the decision was pronounced by so learned and careful a jurist as the late Associate Justice Gray, sitting at circuit. This was under a Massachusetts statute, where a suit commenced in the state court might be renewed in 12 months, and was renewed in the United States court. See, also, *Harrison v. Remington Paper Co.*, 140 Fed. 386, 72 C.C.A. 405, 3 L.R.A. (N.S.) 954, 5 Ann.Cas, 314; *Kansas City Hydraulic Press Brick Co. v. National Surety Co.*, 167 Fed. 496, 93 C.C.A. 132. In both cases, under the renewal statute of Kansas, jurisdiction was maintained in the national court, where the cases had been originally brought and dismissed in the state court. In *Brown v. Erie Railroad Co.*, 176 Fed. 544, 100 C.C.A. 132, a similar ruling was made as to the Iowa statute, and in *Alexander, et al. v. Gordon, et al.*, 101 Fed. 91, 41 C.C.A. 228, the Arkansas renewal statute of limitations was sustained, although both the original suit and that renewed had been brought in the United States court." (emphasis added) 224 Fed. at 812.

*Fordham v. Hicks* was decided long before *Erie Railroad Co. v. Tompkins, supra.* While *Fordham v. Hicks* represents what is still in this court's judgment for reasons hereinafter stated the correct result, the reasons stated in *Fordham v. Hicks* are not valid when examined in the light of *Erie Railroad Co. v. Tompkins, Guaranty Trust Co. v. York*, and an additional line of authority cited by neither the plaintiffs nor the defendants.

Especially important to a consideration of this issue are the following portions of the already quoted excerpt from *Guaranty Trust Co. v. York*:

"It is therefore immaterial whether statutes of limitation are characterized either as 'substantive' or 'procedural' in State court opinions in any use of those terms unrelated to the specific issue before us. *Erie R. Co. v. Tompkins* was not an endeavor to formulate scientific legal terminology. It expressed a policy that touches vitally the proper distribution of judicial power between State and federal courts. In essence, the intent of that decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, *the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.* The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result." (emphasis added) 326 U.S. at 109, 65 S.Ct. at 1469, 89 L.Ed. at 2086.

That the thrust of *Erie* is as found in the aforesaid portion of *Guaranty Trust Co. v. York* is indicated by the Supreme Court's characterization of *Erie* in its 1965 decision in *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 in which the Supreme Court stated:

" 'Outcome-determination' analysis was never intended to serve as a talisman. *Byrd v. Blue Ridge Cooperative,* 356 U.S. 525, 537, 78 S.Ct. 893 [900], 2 L.Ed.2d 953, 962. Indeed, the message of *York* itself is that choices between state and federal law are to be made not by application of any automatic, "litmus paper" criterion, but rather by reference to the policies underlying the Erie rule. *Guaranty Trust Co. v. York, supra,* 326 U.S. at 108–112 [65 S.Ct. at 1469–1471], 89 L.Ed. at 2085–2088, 160 A.L.R. 1231. *The Erie rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court.*

" 'Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State. *Swift v. Tyson* introduced grave discrimination by non-citizens against citizens. It made rights enjoyed under the unwritten "general law" vary according to whether enforcement was sought in the state or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the non-citizen. Thus, the doctrine rendered impossible equal protection of the law.' *Erie R. Co. v. Tompkins, supra,* 304 U.S. at 74–75 [58 S.Ct. at 820–821], 82 L.Ed. at 1192, 114 A.L.R. 1487."

So it is that the Supreme Court of the United States beginning in 1937 and continuing through 1965—a span of almost thirty years—has repeatedly emphasized "that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court."

If the plaintiffs had voluntarily dismissed their state court suit against defendant Earl T. Smith and recommenced in that or any other court of this state having jurisdiction, Georgia's renewal statute—assuming recommencement as here within six months—would have prevented the bar of the statute of limitations from attaching. In the spirit of *Erie* "it would be unfair for the character or result . . . to differ because the suit . . . [was recommenced] in a federal court" instead of in state court. Fairness therefore dictates that this United States District Court interpret and apply Georgia's renewal statute the same as if it were a court of this state. That application, of course, results in a lengthening of the statute of limitations on account of the application of Code § 3–808 in this court the same as it would have been lengthened in the courts of this state.

This statute and the Georgia appellate court opinions limiting its application to suits commenced in State court, voluntarily

dismissed and recommenced within six months in a state court, can also be viewed as if it were an attempt by Georgia statute and appellate court decision to limit the jurisdiction of United States District Courts by statute construed as saying that "the statute of limitations is tolled by voluntary dismissal of any action pending in a court of the State of Georgia and a recommencement of said action within six months in a court of the State of Georgia. This privilege shall not apply to actions commenced or recommenced in a United States Court."

In *Markham v. City of Newport News,* 292 F.2d 711 (4th Cir. 1961) the Court of Appeals for the Fourth Circuit considered "a Virginia statute providing that no tort action against a city or other political subdivision of the Commonwealth shall be instituted 'except in a court of the Commonwealth established under or pursuant to the Constitution of Virginia and having jurisdiction and venue ...'"

As applicable to the question before this court the Court of Appeals there stated:

"The jurisdiction of the United States District Courts is fixed by the Congress, its acts being in implementation of Article 3, Section 2 of the United States Constitution. The Constitution provides that the judicial power of the United States shall extend to controversies between citizens of different states. Congress has authorized exercise of that power if the amount in controversy exceeds a specified amount, now $10,000. The cases in the diversity jurisdiction involve rights created by a state, rights which are subject to definition, limitation and, frequently, negation by the state. The fact that the substantive right is a creature of the state, however, does not suggest that the state may deny the judicial power the states conferred upon the United States when they ratified the Constitution or thwart its exercise within the limits of congressional authorization. In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to acts of states which have no power to enlarge or to contract the federal jurisdiction.

"It became axiomatic, therefore, as will be shown presently, that whenever there was a substantive right enforceable in a judicial proceeding in any court of the state, it was enforceable in the courts of the United States if the controversy was between citizens of different states and involved the minimum amount of money.

"*Newport News,* nevertheless, relying on *Detroit v. Osborne,* 1890, 135 U.S. 492, 10 S.Ct. 1012, 34 L.Ed. 260 argues strenuously that the existence of the right is a matter of local law and that state negation of the right was recognized as controlling in federal courts long before *Erie Railroad Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. This leads the city to the conclusion that the state may condition enforcement of the right in any way she sees fit, including a limitation of judicial proceedings to her own courts. Virginia, of course, may impose conditions precedent to enforcement of the right in any court. It has provided that an action such as this may not be maintained unless written notice of the accident is given to the city within sixty days after accrual of the cause of action. Power to impose conditions precedent which will operate in the same way and lead to the same result whether the action be brought in the courts of the state or those of the United States does not carry with it power to oust the federal jurisdiction. However extensive the power of the state to deal with the substantive right, it has no power to defeat the jurisdiction of the federal courts. As the Supreme Court said:

'... In all cases, where a general right is thus conferred, it can be enforced in any Federal court within the State having jurisdiction of the parties. It cannot be withdrawn from the cognizance of such Federal court by any provision of State legislation that it shall only be enforced in a State court....' *Railway Company v. Whitton's Administrator,* 1871, 13 Wall. 270, 286, 80 U.S. 270, 286, 20 L.Ed. 571.

\*  \*  \*  \*  \*  \*

"The Erie doctrine does not extend to matters of jurisdiction or, generally, to matters of procedure. Its basic philosophy is that a federal court exercising its diversity jurisdiction to adjudicate rights created by the state sits as another court of that state and should reach the same result as the state courts would reach in deciding the identical issue. It is conformity in result which is required. . . ." 292 F.2d at 713–718.

■ As in *Markham v. City of Newport News,* the legislature and appellate courts of this state have no power to define or defeat the jurisdiction of this United States District Court by statutorily and/or decisionally limiting the right of litigants in this court to voluntarily dismiss and recommence in six months without the bar of the Georgia statute of limitations attaching. *See,* Wright, Miller & Cooper, Federal Practice and Procedure § 4211, State Attempts to Limit Federal Jurisdiction.

■ For all of these reasons it is this court's considered judgment that Georgia's renewal statute is to be applied in this United States District Court the same as it is applied in the courts of this state. Accordingly, plaintiffs having voluntarily dismissed and recommenced within six months, the "renewed case . . . stand[s] upon the same footing, as to limitation, with the original case." The statute of limitations has therefore not expired. Defendant Smith's defense asserting to the contrary is denied as if it were a motion to dismiss.

## JURISDICTION OF THE PERSON OF DEFENDANT SMITH

The United States is sued by the plaintiffs pursuant to 28 U.S.C. §§ 1346(b), 2401 et seq., and 2671 et seq. Section 1346(b) grants district courts "exclusive jurisdiction of civil actions on claims against the United States . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting under the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Sections 2401 et seq., and 2671 et seq. specify the procedure for such civil actions. Of particular significance is § 2402 specifying that "any action against the United States under Section 1346 shall be tried by the court without a jury . . ." because if this court has jurisdiction of defendant Smith, his liability and his damages will be tried to a jury whereas the liability and damages of the United States will be tried to the court without a jury. The risk of inconsistent, differing results is obvious.

Since the plaintiffs and defendant Earl T. Smith are all citizens and residents of Georgia, there can be no independent jurisdiction over defendant Smith in this court under 28 U.S.C. § 1332,[1] the diversity of citizenship jurisdictional statute. What then is the possible source of this court's jurisdiction over defendant Earl T. Smith?

Plaintiffs and defendant United States rely upon the doctrine of pendent jurisdiction and the Fifth Circuit Court of Appeals' 1975 decision in *Florida East Coast Railway Co. v. United States,* 519 F.2d 1184, holding that where the United States is sued under the Federal Tort Claims Act a non-diverse party sued originally as a third-party defendant may be added and proceeded against as a defendant on account of the district court's pendent jurisdiction. In so holding the Fifth Circuit relied upon its interpretation of the Supreme Court's decision in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and stated:

1. 28 U.S.C. § 1332 provides:
(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of value of $10,-000, exclusive of interest and costs, and is between—

(1) citizens of different States;
(2) citizens of a State, and foreign states or citizens or subjects thereof; and
(3) citizens of different States and in which foreign states or citizens or subjects thereof are additional parties.

"Since it is clear that there was no diversity jurisdiction regarding the claim by Florida East Coast against Troup, we address the only viable basis for asserting the claim in a federal court—pendent jurisdiction. The theory underlying pendent jurisdiction was first expounded in 1933 in *Hurn v. Oursler*. The elements of the doctrine, however, may be traced back to Chief Justice Marshall's decision in *Osborn v. Bank of the United States*, which surveyed the extent of the constitutional grant of jurisdiction in 'all Cases ... arising under ... the Laws of the United States ....' Although the *Hurn* opinion was often viewed restrictively, limiting pendent jurisdiction to cases where federal and state claims were essentially only different labels for the same 'cause of action,' the Supreme Court has now rejected an 'unnecessarily grudging' approach to pendent jurisdiction.

"The leading case on pendent jurisdiction is *United Mine Workers v. Gibbs*. Gibbs had complained that union conduct which damaged his business was both an illegal secondary boycott within the meaning of federal labor legislation and a tortious interference with his contract rights, a cause of action under state law. The Supreme Court held that because the district court had jurisdiction over the federal issue, it also was authorized to decide the state tort law claims. 'Pendent jurisdiction,' the Supreme Court said, 'in the sense of judicial power, exists whenever there is a claim "arising under the Constitution, the Laws of the United States, and Treaties made ... under their Authority ...," and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case"'."

"The Supreme Court explained that the *first prerequisite to the power of a federal court to resolve a state issue is that there be present a claim involving a substantial federal question.* The second condition is that the state and federal claims 'derive from a common nucleus of operative fact.' Finally, the two claims must be such that, were it not for their disparate federal and state character, the plaintiff would ordinarily be expected to try them in one proceeding.

"Florida East Coat's complaint satisfies all the criteria articulated in *Gibbs* for extending the power of a district court to the adjudication of a plaintiff's state law claim against a nondiverse defendant. The railroad's complaint stated a claim under the Federal Tort Claims Act, thus invoking the district court's jurisdiction over a 'substantial federal question.'

\*     \*     \*     \*     \*     \*

"The second prerequisite for pendent jurisdiction is that the state and federal claims 'derive from a common nucleus of operative fact.' The claims by the railroad against the United States and against Troup both arise out of the same two washouts of the K-line, which are alleged to have been caused by negligence in the design and construction of the flood control system. Both Troup and the Corps were intimately involved in the installation of that system. The issue of federal immunity depended on complex factual issues regarding the causes of the washout. Therefore, a substantial number of the factual issues concerning both the United States or Troup were common to both.

"Finally, the claims asserted by the railroad against the government and Troup were such that, apart from their federal and state origins, one would ordinarily expect that they would all be tried at one hearing." (emphasis added). 519 F.2d at 1193.

Since then—1975—*Florida East Coast Railway Co. v. United States* has been cited approvingly to support joinder where jurisdiction existed both under the Federal Tort Claims Act and some other statute but has not been re-examined or applied again to the joinder of a non-diverse defendant where the sole basis for jurisdiction is the Federal Tort Claims Act. *See, Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1024 n.1 (5th Cir. 1978); there the

court found admiralty and/or pendent jurisdiction.

Unlike the non-diverse defendant in *Florida East Coast Railway Co. v. United States,* defendant Earl T. Smith was not proceeded against as a third-party defendant before being sued directly as a defendant. Indeed, defendant United States has not even argued that defendant Smith could have been proceeded against as a third-party defendant or through a cross-claim. A third-party defendant is "a person not a party to the action who is or may be liable to . . . [the United States] for all or part of the plaintiff's claim against . . . [the United States]." Rule 14, Federal Rules of Civil Procedure. A cross-claim would assert that defendant Earl T. Smith is or may be liable to the United States for all or part of the claim asserted by the plaintiffs against the United States. Rule 13(g), Federal Rules of Civil Procedure.

Since *Florida East Coast Railway Co. v. United States* was decided in 1975 the Supreme Court of the United States has considered and fully discussed pendent jurisdiction on two occasions—on June 24, 1976, in *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 and on June 21, 1978, in *Owen Equipment and Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274. If *Florida East Coast Railway Co. v. United States* were re-examined in light of these subsequent decisions it seems to this court that the Fifth Circuit Court of Appeals—now the Eleventh Circuit Court of Appeals—would conclude that pendent jurisdiction did not exist. That, of course, is a mere speculative opinion that may or may not come to pass. Suffice it to say that this case is controlled by these subsequent Supreme Court opinions which come after and clarify *United Mine Workers v. Gibbs,* the Supreme Court's 1966 case which the Fifth Circuit relied upon in *Florida East Coast Railway Co. v. United States.*

Before discussing pendent or ancillary jurisdiction it is important to point out that the Supreme Court has repeatedly emphasized that even if there is a basis for the exercise of pendent or ancillary jurisdiction, "pendent jurisdiction, in the sense of judicial *power* . . . need not be exercised in every case in which it is found to exist. It has consistently been recognized that *pendent jurisdiction is a doctrine of discretion not of plaintiff's right.* Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 ALR 1487." (emphasis added). *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

Two questions must therefore be answered in the light of the said decisions of the Supreme Court of the United States: (a) Does the doctrine of pendent jurisdiction extend to confer jurisdiction in this court over defendant Earl T. Smith, a non-diverse party, as to whom no independent basis of federal jurisdiction exists, and (b) If pendent jurisdiction does extend to confer jurisdiction over defendant Earl T. Smith, should this court in the exercise of its discretion employ or utilize its pendent jurisdiction over defendant Earl T. Smith?

## PENDENT OR ANCILLARY JURISDICTION

Pendent, or as described by noted commentators Wright, Miller & Cooper,[2] Ancillary Jurisdiction of United States Courts, while broadly defined by those noted commentators, to wit:

"The most important instance in which the federal courts hear cases over which no subject matter jurisdiction is expressly conferred on them by the Constitution, or by federal statute, is when the ill-defined concept of 'ancillary jurisdiction' is invoked. According to this concept, a district court acquires jurisdiction of a case or controversy in its entirety, and, as an incident to the disposition of the matter properly before it, it may decide other

---

2. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3523.

matters raised by the case of which it could not take cognizance were they independently presented. Thus, if the federal court has jurisdiction of the principal action, it also may hear any ancillary proceeding therein, regardless of the citizenship of the parties, the amount in controversy, or any other factor that normally would determine subject matter jurisdiction.

"Ancillary jurisdiction exists because without it the federal court neither could dispose of the principal case effectively nor do complete justice in the dispute that is before the tribunal. Viewed from this perspective then, the concept is a common-sense solution to the problems of piecemeal litigation that otherwise would arise by virtue of the limited jurisdiction of the federal courts prescribed in Article III and the complexity of many modern lawsuits." (footnotes omitted).

has been more narrowly defined by the Supreme Court of the United States as follows:

"Pendent jurisdiction, in the sense of judicial power, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues there is power in federal courts to hear the whole." (footnotes omitted). *United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 227 (1966).

Pendent jurisdiction was found to exist in *Mine Workers v. Gibbs* and its discretionary exercise was found to be proper. The Supreme Court twenty-two years later explained *Gibbs* as follows in *Owen Equipment and Erection Co. v. Kroger*:

"In affirming the District Court's judgment, the Court of Appeals relied upon the doctrine of ancillary jurisdiction, whose contours it believed were defined by this Court's holding in *Mine Workers v. Gibbs*, supra. The *Gibbs* case differed from this one in that it involved pendent jurisdiction, which concerns the resolution of a plaintiff's federal and state-law claims against a single defendant in one action. By contrast, in this case there was no claim based upon substantive federal law, but rather state-law tort claims against two different defendants. Nonetheless, the Court of Appeals was correct in perceiving that *Gibbs* and this case are two species of the same generic problem: Under what circumstances may a federal court hear and decide a state-law claim arising between citizens of the same State? But we believe that the Court of Appeals failed to understand the scope of the doctrine of the *Gibbs* case.

"The plaintiff in *Gibbs* alleged that the defendant union had violated the common law of Tennessee as well as the federal prohibition of secondary boycotts. This Court held that, although the parties were not of diverse citizenship, the District Court properly entertained the state-law claim as pendent to the federal claim.

\* \* \* \* \* \*

"It is apparent that *Gibbs* delineated the constitutional limits of federal judicial power. But even if it be assumed that the District Court in the present case had constitutional power to decide the respondent's lawsuit against the petitioner, it does not follow that the decision of the Court of Appeals was correct. Constitutional power is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over

a particular controversy. For *the juris-diction of the federal courts is limited not only by the provisions of Art III of the Constitution, but by the Acts of Congress.* Palmore v. United States, 411 U.S. 389, 401, 93 S.Ct. 1670 [1678], 36 L.Ed.2d 342; *Lockerty v. Phillips,* 319 U.S. 182, 187, 63 S.Ct. 1019 [1022], 87 L.Ed. 1339; *Kline v. Burke Constr. Co.,* 260 U.S. 226, 234, 43 S.Ct. 79 [82], 67 L.Ed. 226, 24 ALR 1077; *Cary v. Curtis,* [44 U.S. 236] 3 How 236, 245, 11 L.Ed. 576.

"That statutory law as well as the Constitution may limit a federal court's jurisdiction over non-federal claims is well illustrated by two recent decisions of this Court, *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276, and *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511.

\* \* \* \* \* \*

"The *Aldinger* and *Zahn* cases thus make clear that a finding that federal and nonfederal claims arise from a 'common nucleus of operative fact,' the test of *Gibbs,* does not end the inquiry into whether a federal court has power to hear the nonfederal claims along with the federal ones. Beyond this constitutional minimum, *there must be an examination of the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdiction over the federal claim,* in order to determine whether 'Congress in [that statute] has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim. *Aldinger v. Howard,* supra, at 18, 96 S.Ct. 2413, 49 L.Ed.2d 276." (footnotes omitted) (emphasis added). 437 U.S. 365, 371, 98 S.Ct. 2396 at 2401, 57 L.Ed.2d 274, 280.

Between *Mine Workers v. Gibbs* and *Owen Equipment and Erection Co. v. Kroger* the Supreme Court considered and discussed pendent jurisdiction in a case factually more analogous to this case than either *Mine Workers* or *Owen Equipment.* The year was 1976 and the case was *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276.

In *Aldinger* petitioner sued various county officials under 42 U.S.C. § 1983 and its jurisdictional statute 28 U.S.C. § 1343(3). At the time the county could not be sued under 42 U.S.C. § 1983 and no other federal statute gave a basis of federal jurisdiction over the county. As to state-law claims against the county, the appellate court was urged to find that pendent jurisdiction existed as to the county. The Supreme Court stated:

"This case presents the 'subtle and complex question with far-reaching implications,' alluded to but not answered in *Moor v. County of Alameda,* 411 U.S. 693, 715, 93 S.Ct. 1785 [1798], 36 L.Ed.2d 596 (1973), and *Philbrook v. Glodgett,* 421 U.S. 707, 720, 95 S.Ct. 1893 [1901], 44 L.Ed.2d 525 (1975): *whether the doctrine of pendent jurisdiction extends to confer jurisdiction over a party as to whom no independent basis of federal jurisdiction exists.*

\* \* \* \* \* \*

"The question *whether 'pendent' federal jurisdiction encompasses* not merely the litigation of additional claims between parties with respect to whom there is federal jurisdiction, but also the impleading of *additional parties with respect to whom there is no independent basis of federal jurisdiction,* has been much litigated in other federal courts and much discussed by commentators since this Court's decision in *Gibbs. Gibbs,* in turn, is the most recent in a long line of our cases dealing with the relationship between the judicial power of the United States and the actual contours of the cases and controversies to which that power is extended by Art III.

"In *Osborn v. Bank of the United States,* [22 U.S. 738], 9 Wheat 738, 6 L.Ed. 204 (1824), Mr. Chief Justice Marshall in his opinion for the Court addressed the argument that the presence in a federal lawsuit of questions which were not dependent on the construction of a law of the United States prevented the federal court from exercising Art III jurisdiction, even in a case in which the plaintiff had

been authorized by Congress to sue in federal court. Noting that '[t]here is scarcely any case, every part of which depends' upon federal law, *id.*, at 820, 6 L.Ed. 204, the Chief Justice rejected the contention:

'If it be a sufficient foundation for jurisdiction, that the title or right set up by the party, *may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction,* provided the facts necessary to support the action be made out, *then all the other questions must be decided as incidental* to this, which gives that jurisdiction. Those other questions cannot arrest the proceedings . . . .

'We think, then that when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, *it is in the power of congress to give the Circuit Courts jurisdiction of that cause,* although other questions of fact or of law may be involved in it.' *Id.*, at 822–823, 6 L.Ed. 204.

"This doctrine was later applied in *Silver v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), . . . [and] A few years later, in *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933),

\* \* \* \* \* \*

"These cases, from *Osborn* to *Gibbs*, show that in treating litigation where nonfederal questions or claims were bound up with the federal claim upon which the parties were already in federal court, this Court has found nothing in Art III's grant of judicial power which prevented adjudication of the nonfederal portions of the parties' dispute. *None of them however, adverted to the separate question, involved in the instant case, of whether a nonfederal claim could in turn be the basis for impleading a party over whom no independent federal jurisdiction exists, simply because that claim could be derived from the 'common nucleus of operative fact' giving rise to the dispute between the parties to the federal claim.*

"But while none of the foregoing line of cases discussed the impleading of additional parties, other decisions of this Court have developed a doctrine of 'ancillary jurisdiction,' and it is in part upon this development—and its relationship to *Gibbs*—that petitioner relies to support 'pendent party' jurisdiction here. Under this doctrine, the Court has identified certain considerations which justified the impleading of parties with respect to whom there was no independent basis of federal jurisdiction.

\* \* \* \* \* \*

"The doctrine of ancillary jurisdiction developed in the foregoing cases is bottomed on the notion that *since federal jurisdiction in the principal suit effectively controls the property or fund under dispute, other claimants thereto should be allowed to intervene in order to protect their interests, without regard to jurisdiction.*

\* \* \* \* \* \*

"For purposes of addressing the jurisdictional question in this case, however, we think it quite unnecessary to formulate any general, all-encompassing jurisdictional rule. Given the complexities of the many manifestations of federal jurisdiction, together with the countless factual permutations possible under the Federal Rules, there is little profit in attempting to decide, for example, whether there are any 'principled' differences between pendent and ancillary jurisdiction; or, if there are, what effect *Gibbs* had on such differences. Since it is upon *Gibbs'* language that the lower federal courts have relied in extending the kind of pendent-party jurisdiction urged by petitioner here, we think the better approach is to determine what *Gibbs* did and did not decide, and to identify what we deem are important differences between the jurisdiction sustained in *Gibbs* and that asserted here.

"*Gibbs* and its lineal ancestor, *Osborn*, were couched in terms of Art III's grant of judicial power in 'Cases . . . arising under this Constitution, the Laws of the

United States, and [its] Treaties,' since they (and implicitly the cases which linked them) represented inquiries into the scope of Art III jurisdiction in litigation where the 'common nucleus of operative fact' gave rise to nonfederal questions or claims between the parties. *None of them posed the need for a further inquiry into the underlying statutory grant of federal jurisdiction* insofar as a flexible analysis of concepts such as 'question,' 'claim,' and 'cause of action,' because Congress had not addressed itself by statute to this matter. In short, Congress had said nothing about the scope of the word 'Cases' in Art III which would offer guidance on the kind of elusive question addressed in *Osborn* and *Gibbs*: whether and to what extent jurisdiction extended to a parallel state claim against the existing federal defendant.

"Thus, it was perfectly consistent with Art III, and the particular grant of subject-matter jurisdiction upon which the federal claim against the defendant in those cases was grounded, to require that defendant to answer as well to a second claim deriving from the 'common nucleus' of fact, though it be of state-law vintage. *This would not be an 'unfair' use of federal power by the suing party, he already having placed the defendant properly in federal court for a substantial federal cause of action.* Judicial economy would also be served because the plaintiff's claims were 'such that he would ordinarily be expected to try them all in one judicial proceeding ....' *Gibbs*, 383 U.S., at 725, 86 S.Ct. 1130, 16 L.Ed.2d 218.

"*The situation with respect to the impleading of a new party, however, strikes us as being both factually and legally different from the situation facing the Court in Gibbs and its predecessors.* From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But *it is quite an-*

*other thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to implead an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction,* simply because his claim against the first defendant and his claim against the second defendant 'derive from a common nucleus of operative fact.' *Ibid.* True, the same considerations of judicial economy would be served insofar as plaintiff's claims 'are such that he would ordinarily be expected to try them all in one judicial proceeding ....' *Ibid.* But the addition of a completely new party would run counter to the well-established principle that *federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress.*

\*   \*   \*   \*   \*   \*

"The question here, which it was not necessary to address in *Gibbs* or *Osborn*, *is whether by virtue of the statutory grant of subject-matter jurisdiction, upon which petitioner's principal claim against the treasurer rests, Congress has addressed itself to the party as to whom jurisdiction pendent to the principal claim is sought.* And it undoubtedly has done so.

"Congress has in specific terms conferred Art III jurisdiction on the district courts to decide actions brought to redress deprivations of civil rights. Under the opening language of § 1343, those courts 'shall have original jurisdiction of any *civil action authorized by law* to be commenced by any person ...' (emphasis added). The civil rights action set out in § 1983 is, of course, included within the jurisdictional grant of subsection (3) of § 1343.

\*   \*   \*   \*   \*   \*

*In short, as against a plaintiff's claim of additional power over a 'pendent party,' the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which*

*federal judicial power has been extended by Congress.*

\*　　\*　　\*　　\*　　\*　　\*

"Two observations suffice for the disposition of the type of case before us. If the new party sought to be impleaded is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence.

"We conclude that in this case Congress has by implication declined to extend federal jurisdiction over a party such as Spokane County."

As in *Aldrich* the reach of the statutes conferring jurisdiction should be construed in light of the cause of action as to which Congress has extended this court's judicial power.

Article III of the Constitution provides in Section 2 that:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—*to Controversies to which the United States shall be a Party*;—to Controversies between two or more States;—between a State and Citizens of another State;—*between Citizens of different States*;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign State, Citizens or Subjects." (emphasis added).

As "to Controversies to which the United States shall be a Party," Congress in turn by statute conferred original jurisdiction of all civil actions commenced by the United States upon district courts, 28 U.S.C. § 1345, and from time to time conferred original jurisdiction of certain civil actions against the United States upon the district courts and in some instances conferred concurrent jurisdiction upon the Court of Claims. 28 U.S.C. § 1346(a) through (f). Some sections of § 1346 contain both the consent of the United States as a sovereign to be sued and the elements of the cause of action that if established will result in a judgment against the United States. For instance, (a)(1) provides:

"... for the recovery on any *internal-revenue tax* alleged to have been *erroneously or illegally assessed or collected*, or any *penalty* claimed to have been *collected without authority* or any sum alleged to have been excessive or in any manner *wrongfully collected under the internal-revenue laws*;"

and (c) provides:

"(c) The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section."

Lawsuits commenced under (a)(1) and (e) containing both the consent of the United States to be sued and the elements of the cause of action are said to be federal claims. As the Supreme Court used that term, "a 'federal claim' means one as to which an independent basis for federal jurisdiction exists ..." whereas "the term 'non-federal claim' means one as to which there is no independent basis for federal jurisdiction." *Owen Equipment and Erection Co. v. Kroger*, n.11, 437 U.S. at 372, 98 S.Ct. at 2401, 57 L.Ed.2d at 281.

On the other hand, (b) which provides:

"(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or

loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

is the consent of the United States to be sued for the negligent or wrongful acts or omissions of its employees the same as private persons can be sued under the law of the state where the incident occurred. The cause of action of the injured party is determined by state law. *See,* 28 U.S.C. § 2671 *et seq.* The laws of the United States are not thus independently the basis for federal jurisdiction. Federal jurisdiction is dependent upon the laws of the state where the incident occurred. As the Supreme Court and circuit courts of appeal have repeatedly indicated,

> "The purpose of the Act was not 'the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence . . . Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.' *Feres v. U. S.,* 340 U.S. 135, 141, 142, 71 S.Ct. 153, 157, 95 L.Ed. 152.

> 'This Act does not subject the Government to a previously unrecognized type of obligation. Through hundreds of private relief acts, each Congress for many years has recognized the Government's obligation to pay claims on account of damage to or loss of property or on account of personal injury or death caused by negligent or wrongful acts of employees of the Government. This Act merely substitutes the District Courts for Congress as the agency to determine the validity and amount of the claims. It suggests no reason for reading into it fine distinctions between various types of such claims.' *U. S. v. Yellow Cab Co.,* 340 U.S. 543, 548, 71 S.Ct. 399, 404, 95 L.Ed. 523."
> *In Re Texas City Disaster Litigation,* 197 F.2d 771 (5th Cir. 1952), at 775.

Viewed realistically the Federal Tort Claims Act is similar in all respects to the already quoted portion of Article III of the Constitution and 28 U.S.C. § 1332 which vests district courts with original jurisdiction of civil actions "where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—(1) Citizens of different States . . . ." As with the Federal Tort Claims Act jurisdiction arises from federal law but the cause of action in such civil actions is determined by state law. Likewise there is no independent basis for federal jurisdiction over diversity claims. *See, Owen Equipment and Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274.

There being no independent basis for federal jurisdiction over tort claims against the United States, this court's task in determining whether or not it has the power to exercise pendent party jurisdiction of Earl T. Smith is controlled by *Aldinger v. Howard,* to wit:

> "In short, as against a plaintiff's claim of additional power over a 'pendent party,' the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which federal judicial power has been extended by Congress.

> "Resolution of a claim of pendent-party jurisdiction, therefore, calls for careful attention to the relevant statutory language." 427 U.S. at 17, 96 S.Ct. at 2421, 49 L.Ed.2d at 288.

The scope of the consent of the United States to be sued as if it were a private party, was considered by the Supreme Court in 1950—just four years after the Act was passed in 1946—in *United States v. Yellow Cab Co.* As to the purpose of the Act the Court stated:

> "This Act does not subject the Government to a previously unrecognized type of obligation. Through hundreds of private relief acts, each Congress for many years has recognized the Government's obligation to pay claims on account of

damage to or loss of property or on account of personal injury or death caused by negligence or wrongful acts of employees of the Government. This Act merely substitutes the District Courts for Congress as the agency to determine the validity and amount of the claim." 340 U.S. 543, 548, 71 S.Ct. 399 at 403, 95 L.Ed. 523, 529.

The Act as passed in 1946 made no mention of those who may be joint tortfeasors with the employee of the United States. Congress in amending the Act has made no mention of those who may be joint tortfeasors with the employee of the United States.

At the time the Act was passed in 1946 United States Courts had been exercising jurisdiction over diversity of citizenship cases since 1789. Congress, pursuant to its constitutionally derived Article III power, first gave diversity jurisdiction to the federal courts by the Judiciary Act of 1789.

Between 1789 and 1946 the Constitution was not amended to broaden Article III jurisdiction to permit adding non-diverse parties in instances where diversity jurisdiction already existed. During those many years Congress did not legislatively so extend diversity jurisdiction. Congress' failure to so broaden the diversity jurisdiction statute indicates that it was and always has been Congress' intent to limit diversity jurisdiction cases in United States courts to parties of diverse citizenship.

From 1789 until today diversity cases in United States courts have not been utilized to dispose of all claims arising out of an incident; only claims between diverse parties have been disposed of. Claims between non-diverse parties were resolved in state court. With 157 years of experience in the litigation of diverse claims in federal court and non-diverse claims arising out of the same incident in state court, that Congress has left the limited jurisdiction of United States courts concept undisturbed in amending the diversity jurisdiction statute and in enacting and amending the jurisdiction of tort claims against the United States statute indicates to this court that Congress intended in consenting for the United States to be sued to give United States courts jurisdiction only over those who sue the United States. Joint tort-feasors over whom jurisdiction does not otherwise exist were not intended to be swept into a United States court as part and parcel of a lawsuit against the United States.

Congress in consenting to suits against the United States could have consented to the United States being sued in federal or state court. This of course would have made it possible to also sue non-diverse parties and permitted the resolution of all claims in one lawsuit. That Congress failed to do so is another indication that it did not intend for all claims against all parties to be resolved in one lawsuit against the United States.

■ This court therefore concludes that the reach of the jurisdictional statute by which Congress consented for the United States to be sued for tort claims, 28 U.S.C. § 1346(b), construed in light of the underlying state law cause of action as to which federal judicial power has been extended, was not intended and therefore does not in the circumstances of this case include a non-diverse party over whom this United States court does not otherwise have jurisdiction.

Plaintiff's claim against defendant Earl T. Smith is therefore DISMISSED.